857 A.2d 159

**Duane McCORMACK, as parent and next of friend of Ryan McCormack, et al.**

**v.**

**BOARD OF EDUCATION OF BALTIMORE COUNTY.**

**No. 1329, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Sept. 2, 2004.

**296**

Amy M. Orsi (Stephen A. Markey, III on the brief), Towson, for Appellant.

J. Michael Sloneker (Gregory L. VanGeison, Rachel L. Stewart, Anderson, Coe & King, LLP on the brief), Baltimore, for Appellee.

Panel: ADKINS, KRAUSER and RAYMOND G. THIEME, JR., (Retired, specially assigned) JJ.

KRAUSER, Judge.

Four-year-old Ryan McCormack was riding home on a school bus, when the bus crossed the center line of the road, striking first an oncoming vehicle and then a utility pole and a tree. Upon colliding with the front porch of a nearby house, the bus came to rest, leaving Ryan injured and the driver of the bus dead. This tragic mishap spawned the litigation now before us.

Seeking damages for Ryan's injuries and reimbursement for the monies they had spent for his care and treatment,[1] Ryan's parents, appellants Duane and Renee McCormack, brought a negligence action, on behalf of Ryan and themselves, in the Circuit Court for Baltimore County against appellee, the Board of Education of Baltimore County ("the Board").[2]

---

1. The McCormacks also sought compensation for lost wages.

2. The estate of Virginia T. Carter, the bus driver, was originally a defendant in the case; however, her estate was "dismissed prior to trial."

When the Board conceded liability, the case was tried before a jury solely on the issue of damages. That trial ended in, what was for the McCormacks, a disappointingly small verdict. Blaming this unhappy result on certain evidential rulings made by the circuit court, the McCormacks seek rectification from this Court.

Interestingly enough, the rulings of which they complain do not involve the physical injuries that Ryan sustained as a result of this accident. Rather, they relate to the psychological injuries that he purportedly suffered. The McCormacks claim that the circuit court's exclusion of certain evidence of those injuries—specifically, the videotaped testimony of Ryan's treating psychologist and Ryan's psychological and psychiatric records—requires this Court to vacate the judgment below and order a new trial.

Persuaded by the Board's argument that the McCormacks' own claim for medical expenses created a conflict of interest with their son's patient-psychologist privilege, the circuit court gave the McCormacks a choice: either agree to a postponement of the trial so that a guardian could be appointed, pursuant to section 9–109 of the Courts and Judicial Proceedings Article ("CJP"),[3] to assert or waive that privilege or face a court order, prohibiting the introduction of the testimony and records at issue. If they requested a postponement for the appointment of a guardian, the court warned, they would have to pay the Board some or all of the costs and expenses that the Board had incurred in preparing for trial.[4] When the McCormacks chose to forgo the appointment of a guardian

---

**3.** Md.Code (1974, 2002 Repl.Vol.), § 9–109 of the Courts and Judicial Proceedings Article ("CJP").

**4.** Although there is no record of the judicial threat to require the McCormacks to pay the Board's trial preparation costs if the case was postponed to appoint a guardian, counsel for both sides, at oral argument before this Court, agreed that the circuit court had made such a threat in chambers and that the Board, at that time, had estimated that its trial preparation costs might reach $10,000. They disagreed, however, as to whether the court had stated that it was its intent for appellants to pay the whole or only part of that figure.

(presumably to avoid paying the Board's trial preparation expenses), the court excluded the videotaped testimony and the records.

The exclusion of that evidence left the court, in its view, with no alternative but to then prohibit the McCormacks from testifying as to any observations they had regarding Ryan's behavior that extended beyond the first few days after the accident. Without the records or the psychologist's testimony, the McCormacks could not establish, the court reasoned, a causal connection between the accident and Ryan's subsequent long-term behavior.

Pulling all of this together, the issue presented by this appeal is:

Whether the circuit court erred in excluding the videotaped deposition of the McCormacks' expert, Joseph H. Kaine, Ph.D., a psychologist who evaluated and treated Ryan following the accident; the psychiatric and psychological records of Dr. Kaine, Mahmood Jahromi, M.D., and Steven Zimmerman, Ph.D.; and evidence of Ryan McCormack's observable, long-term psychological problems.[5]

For the reasons that follow, we shall vacate the judgment of the circuit court and remand for further proceedings consistent with this opinion.

## FACTS

On June 7, 1999, Ryan was a passenger on a school bus, taking him home from school. Having dropped off the other children, the bus was empty, except for Ryan, the bus driver, Virginia T. Carter, and the bus aide, Ethel Reinhart.

While driving on Golden Ring Road in Baltimore County, the bus driver lost control of the bus. After striking an oncoming car, an electric pole, and then a tree, the bus came to a stop upon colliding with the front porch of a nearby

---

5. We have made only modest changes in the wording of the issue, as framed by the McCormacks, for purposes of clarity.

house.  The bus driver was killed;  Reinhart and four-year-old Ryan were injured.

At trial, a now nine-year-old Ryan testified that he "remember[ed] hitting [his] head . . . [a]bout two or three times."  He also recalled seeing the bus driver fall out of her seat and down the bus stairs.  After the accident, the bus aide, in the midst of "helicopters, people, and a woman screaming," checked Ryan's seat belt; it was loose but fastened.  She then attempted to shield Ryan, who was crying and bleeding from his head, from seeing the bus driver's body.

Dispatched to the scene of the bus accident, Officer Raoul Willem of the Baltimore County Police Department observed Ryan "crying very hard."  According to the officer, Ryan was "very nervous" but then stopped crying and became "lethargic."  Fearing that Ryan had gone into shock, the officer immediately sought medical help.

Ryan was thereafter transported to a hospital.  When he arrived, he seemed, according to Mrs. McCormack, "[v]ery sleepy."  She said that the doctors "stapled up his head and kept an eye on him for [a] concussion."  To Mr. McCormack, Ryan appeared "very pale, very quiet . . . [and] in shock."  A day or two after the accident, Mrs. McCormack noticed a change in Ryan.  She was, however, prohibited by the court ruling now at issue from describing Ryan's behavioral and emotional problems in the weeks that followed the accident.

The accident left Ryan, in his words, "hurt" and "scared." He chose not to ride the school bus for the three days of the school year that remained.  After that, he rode on the school bus, except when his fears required his mother to drive him to school.  When he does ride the bus, he testified that he sits "[o]ne seat in front of the back of the bus . . . [s]o if [he] ever get[s] in another bus accident, [he] can just get out of [his] seat and make sure everybody's all right, then get people to open the emergency exit and they can escape and [he] could, too."

He further testified that he had nightmares following the accident and that he thinks about it "[o]nce in a while [sic],"

especially about "getting hurt in the bus accident and [the bus driver] dying, [and] stuff[ ] falling downstairs." Joseph H. Kaine, Ph.D., Ryan's psychologist, testified, at his videotaped deposition-the judicial exclusion of which is the principal issue before us-that Ryan suffered from post-traumatic stress disorder following the accident, which manifested itself in, among other things, wetting himself during the day, increased anxiety, aggressive behavior, and nightmares.

## DISCUSSION

The McCormacks contend that the circuit court erred in excluding, pursuant to section 9–109(b) of the Courts and Judicial Proceedings Article,[6] the videotaped deposition of Ryan's psychologist, Joseph H. Kaine, Ph.D. and the psychological and psychiatric records of Ryan's treatment[7] that were to be introduced through his testimony. Section 9–109(c)'s requirement that a guardian be appointed to assert or waive the patient-psychologist privilege,[8] "[i]f a patient is incompetent" to do so for himself, *see* CJP § 9–109(c), applies "only within the context of a custody dispute," the McCormacks insist. And, furthermore, section 9–109(d)(3)[9] permitted the

---

**6.** CJP § 9–109(b) provides:

Unless otherwise provided, in all judicial, legislative, or administrative proceedings, a patient or the patient's authorized representative has a privilege to refuse to disclose, and to prevent a witness from disclosing:
(1) Communications relating to diagnosis or treatment of the patient; or
(2) Any information that by its nature would show the existence of a medical record of the diagnosis or treatment.

**7.** The records that were to be introduced were apparently the records of Joseph H. Kaine, Ph.D., Mahmood Jahromi, M.D., and Steven Zimmerman, Ph.D.

**8.** Section 9–109(b)'s privilege applies to both psychologists and psychiatrists, but we will refer to it as the patient-psychologist privilege for ease of reference. *See* CJP § 9–109(a).

**9.** Section 9–109(d)(3) states, in part: "There is no privilege if:.... In a civil or criminal proceeding: (i) The patient introduces his mental

introduction of Dr. Kaine's testimony, they assert, because Ryan introduced the subject of his "psychological injuries ... as an element of his claim," thereby waiving the privilege.

That error was compounded, the McCormacks claim, when the circuit court excluded their testimony "regarding [their] long term observations of changes in Ryan McCormack's behavior following the bus accident," on the grounds "that without the support of medical testimony, any other testimony regarding behavioral changes that occurred after the first few days of the accident" was immaterial.

After the Board conceded liability for the accident, this matter proceeded to trial on the issue of damages alone. On the first day of trial, the Board moved to exclude Dr. Kaine's videotaped deposition as well as Ryan's psychological and psychiatric records, which were to be introduced through Dr. Kaine's testimony. In support of that motion, the Board argued that, notwithstanding its request to take the deposition of Dr. Kaine, the McCormacks "ignored [its] request to sched-ule the deposition in a collaborative fashion as [required] under the discovery guidelines," and that when it "served a deposition notice [it was] informed that he would not appear for that discovery deposition." It further argued that Ryan's patient-psychologist privilege, under section 9–109(b), could not be waived by his parents because their interest in obtain-ing reimbursement for the costs of his psychological and psychiatric treatment conflicted with Ryan's interest in keep-ing his mental condition a private matter.[10]

The circuit court rejected the Board's first ground, but granted the Board's motion in limine on the second—that the McCormacks could not waive Ryan's privilege. Consistent with this ruling, it later prohibited the McCormacks from

---

condition as an element of his claim or defense...." CJP § 9–109(d)(3)(i).

10. This argument was raised orally before the circuit court, but was argued in greater detail in the trial memorandum the Board submitted to the circuit court in support of its motion in limine.

testifying about any post-accident behavior of Ryan's that occurred more than a few days after the accident, because of the absence of expert testimony linking that behavior to the accident.

In reviewing the circuit court's decision to exclude the videotaped deposition of Dr. Kaine, Ryan's records, and the McCormacks' observations, we note that the question of the admissibility of evidence is ordinarily " 'left to the sound discretion of the trial court,' so that 'absent a showing of abuse of that discretion, its ruling[ ] will not be disturbed on appeal.' " *J.L. Matthews, Inc. v. Md.-Nat'l Capital Park & Planning Comm'n,* 368 Md. 71, 91, 792 A.2d 288 (2002) (quoting *Farley v. Allstate Ins. Co.,* 355 Md. 34, 42, 733 A.2d 1014 (1999)). But the "[a]pplication of that standard ... depends on whether the trial judge's ruling under review was based on a discretionary weighing of relevance in relation to other factors or on a pure conclusion of law." *Id.* at 92, 792 A.2d 288. When "the trial judge's ruling involves a weighing, we apply the more deferential abuse of discretion standard. On the other hand, when the trial judge's ruling involves a legal question, we review the trial court's ruling *de novo.*" *Id.* (footnote omitted). Because the circuit court's ruling that the McCormacks could not waive Ryan's patient-psychologist privilege was based on a conclusion of law, specifically its interpretation of section 9–109(c), we shall review that decision *de novo.*

That review will have to wait, however, to permit us to briefly consider two preliminary claims made by the McCormacks. They are: first, that the circuit court erred in granting the motion in limine because it was untimely, having been filed by the Board after the deadline for the filing of such motions had passed and, second, that Ryan's patient-psychologist privilege was waived, pursuant to section 9–109(d)(3), when Ryan, through his parents, "introduce[d] his mental condition as an element of his claim." *See* CJP § 9–109(d)(3)(i).

The first issue requires no more discussion than to note that, although the McCormacks opposed the Board's motion in limine at trial, they never claimed that the Board's motion was untimely.[11] Consequently, they cannot do so now. Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court...."). Nor does the McCormacks' second argument, that Ryan's patient-psychologist privilege was waived when Ryan, through his parents, "introduce[d] his mental condition as an element of his claim," merit substantive consideration. *See* CJP § 9–109(d)(3)(i). It, too, was not raised by the McCormacks at trial and, therefore, as the first claim, it founders upon that procedural rock.

We turn now to the issue that has been preserved for our review: the McCormacks' contention that the circuit court wrongly excluded Dr. Kaine's videotaped deposition and records based upon an erroneous interpretation of section 9–109(c). That section provides that, "[i]f a patient is incompetent to assert or waive this privilege, a guardian shall be appointed and shall act for the patient. A previously appointed guardian has the same authority." *Id.* § 9–109(c).

The McCormacks maintained that, as Ryan's parents, they were his guardians and therefore had the authority to waive his privilege. The Board of course disagreed. While acknowledging that the McCormacks, as Ryan's parents, might fall within the category of a "previously appointed guardian" under section 9–109(c), it insisted that they "as individual [p]laintiffs in their own right in this matter, ha[d] a pecuniary interest in the pursuit and outcome of th[e] litigation, and thus [we]re precluded from acting as guardians to protect Ryan's

11. At oral argument before this Court, counsel for the McCormacks argued that they raised this issue in a conference with the court that occurred off the record. This assertion was denied by counsel for the Board. As there is no record of the McCormacks raising the issue, there is nothing for us to review. *See Robinson v. State,* 66 Md.App. 246, 251, 503 A.2d 725 (1986) (noting that what transpires at an off-the-record bench conference is not preserved for appellate review).

interests for purposes of [section] 9–109(c)." [12] In other words, the Board claimed that the McCormacks' interest in disclosing information about Ryan's post-accident mental condition, to recover the costs of Ryan's psychiatric and psychological care and treatment, conflicted with Ryan's interest in the non-disclosure of such sensitive information.

That potential conflict of interest, the court held, necessitated the appointment of a guardian under section 9–109(c), to assist Ryan in deciding whether to waive his patient-psychologist privilege. [13] To determine the validity of the court's ruling, we invoke the canons of statutory construction.

The first such canon, indeed the "cardinal rule" of statutory interpretation, "is to ascertain and effectuate legislative intent." *Mona Elec. Servs., Inc. v. Shelton*, 148 Md.App. 1, 8, 810 A.2d 1022 (quoting *Mayor & City Council v. Chase*, 360 Md. 121, 128, 756 A.2d 987 (2000)), *aff'd*, 377 Md. 320, 833 A.2d 527 (2003). Therefore "we look first to the words of the statute, giving them their 'natural and ordinary signification, bearing in mind the statutory aim and objective.'" *Azarian v. Witte*, 140 Md.App. 70, 96, 779 A.2d 1043 (2001) (quoting *Richmond v. State*, 326 Md. 257, 262, 604 A.2d 483 (1992)), *aff'd*, 369 Md. 518, 801 A.2d 160 (2002). If possible, " 'a statute is to be read so that no word, phrase, clause or

---

**12.** This quote is from the trial memorandum the Board submitted to the circuit court in support of its motion in limine.

**13.** The circuit court agreed that a guardian had to be appointed, stating tersely: "What [section 9–109(c) ] says is that for a minor the privilege belongs to the child and the parents can't waive it." It is not clear from this or other comments made by the court whether, in so ruling, it was holding that section 9–109 requires that whenever parents have a monetary interest in their child's case, a guardian must be appointed to assist the child in asserting or waiving this privilege, or that the appointment of a guardian is only appropriate where the interests of the parents and their child conflict. In reaching the conclusion that it did, however, the court relied solely on *Nagle v. Hooks*, 296 Md. 123, 460 A.2d 49 (1983), which, as we shall later discuss, stands for the proposition that parents cannot waive their child's privilege when their interests conflict with their child's. We therefore accept the Board's uncontested assertion that this was in fact the *ratio decidendi* of the court's decision.

sentence is rendered surplusage or meaningless.' " *Kerpelman v. Smith, Somerville & Case, L.L.C.,* 115 Md.App. 353, 356–57, 693 A.2d 357 (1997) (quoting *Mazor v. State, Dep't of Corr.,* 279 Md. 355, 360, 369 A.2d 82 (1977)).

Moreover, "we must always be cognizant of the fundamental principle that statutory construction is approached from a 'commonsensical' perspective. Thus, we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994) (quoting *Richmond,* 326 Md. at 262, 604 A.2d 483) (internal citations omitted). "We also avoid constructions that would 'lead to absurd [results].' " *Azarian,* 140 Md.App. at 97, 779 A.2d 1043 (quoting *Thanos v. State,* 332 Md. 511, 525, 632 A.2d 768 (1993)). " '[I]f the statute is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature.' " *Kerpelman,* 115 Md.App. at 357, 693 A.2d 357 (quoting *Mazor,* 279 Md. at 361, 369 A.2d 82).

We now apply these time-honored canons of statutory construction to the question of whether section 9–109(c) required the appointment of a guardian, as the circuit court ruled. We begin our analysis by noting that "the psychotherapist-patient privilege is 'rooted in the imperative need for confidence and trust.' " *Jaffee v. Redmond,* 518 U.S. 1, 10, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)).

Highlighting the importance of that privilege, the Supreme Court stated:

> Treatment by a physician for physical ailments can often proceed successfully on the basis of a physical examination, objective information supplied by the patient, and the results of diagnostic tests. Effective psychotherapy, by contrast, depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which

individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.

*Id.*

As the Court of Appeals succinctly put it in *Laznovsky v. Laznovsky,* 357 Md. 586, 745 A.2d 1054 (2000), " '[m]any physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him.' " *Id.* at 613 n. 13, 745 A.2d 1054 (quoting *Taylor v. United States,* 222 F.2d 398, 401 (D.C.Cir.1955)). Indeed, the privilege not only serves the private interest of the patient "[b]y protecting confidential communications between a psychotherapist and her patient from involuntary disclosure," but it "serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem." *Jaffee,* 518 U.S. at 11, 116 S.Ct. 1923. Nor can anyone dispute that "[t]he mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." *Id.*

Mindful of the compelling policy considerations in favor of this privilege, we turn to the words of the statute itself:

(b) *Privilege generally.*—Unless otherwise provided, in all judicial, legislative, or administrative proceedings, a patient or the patient's authorized representative has a privilege to refuse to disclose, and to prevent a witness from disclosing:

(1) Communications relating to diagnosis or treatment of the patient; or

(2) Any information that by its nature would show the existence of a medical record of the diagnosis or treatment.

(c) *Appointment of guardian.*—If a patient is incompetent to assert or waive this privilege, a guardian shall be

appointed and shall act for the patient. A previously appointed guardian has the same authority.

CJP § 9–109(b)–(c).

Sections 9–109(b) and (c) plainly state that, in judicial as well as other types of proceedings, a patient has the right to assert or waive his patient-psychologist privilege. *Id.* But, if the patient is not competent to make such a decision, section 9–109(c) requires the appointment of a guardian to act on the patient's behalf, unless he or she already has such a guardian. *Id.* § 9–109(c). Ryan, a four-year-old minor, was obviously not capable of making such a decision. *See Nagle v. Hooks,* 296 Md. 123, 127, 460 A.2d 49 (1983) ("Certainly a minor under the age of 10 years would be incompetent to make such a decision [as whether to waive or assert his patient-psychologist privilege.]"). Therefore, the statute required that a guardian be appointed to assert or waive Ryan's privilege, unless Ryan already had someone acting on his behalf, who qualified as a "previously appointed guardian" under section 9–109(c).

The McCormacks point out that, as Ryan's parents, they were his guardians under section 5–203 of the Family Law Article and, as the Board concedes, they also fell within the category of a "previously appointed guardian" under section 9–109(c). *See* Md.Code (1984, 1999 Repl.Vol., 2003 Supp.), § 5–203(a)(1) of the Family Law Article ("The parents are the joint natural guardians of their minor child."). Consequently, they maintain that they had the authority to assert or waive Ryan's privilege. But the Board argued below, and the circuit court apparently agreed, that the statute requires the appointment of an independent guardian when the parents are parties to the case and their interests conflict with their child's.

Although the statute is silent on that point, the Court of Appeals has considered such a claim in the context of a child custody case, *Nagle v. Hooks,* 296 Md. 123, 460 A.2d 49 (1983), a fact not lost on either the Board or the circuit court; both of which cited *Nagle* in support of their respective and compatible positions.

*Nagle* involved, an exasperated Court wrote, "the continuing battle over the custody of the minor child of John Stephen Nagle and his former wife, Beth Ann Nagle Hooks." *Id.* at 125, 460 A.2d 49. At a hearing on Nagle's petition to modify custody, Nagle "attempted to have a psychiatrist, who had been seeing the child, testify." *Id.* But Hooks, the custodial parent, "had not given her consent to waive the privilege." *Id.*

"[R]easoning that each parent would have to so consent [to waive the privilege], the chancellor refused to allow the witness to testify regarding matters within the privilege." *Id.* This Court disagreed, holding that only " 'the parent having custody under a court order ha[d] authority to assert the privilege.' " *Id.* at 126, 460 A.2d 49 (quoting *Nagle v. Hooks,* No. 1644, Sept. Term 1981, slip op. at 3 (Md.Ct.Spec.App. Aug. 10, 1982) (per curiam), *rev'd, Nagle,* 296 Md. 123, 460 A.2d 49). We, in effect, agreed with the chancellor's conclusion that Nagle could not waive his child's privilege, but took exception to the chancellor's insistence that both parents had to consent to the waiver for a waiver to be effective. As occasionally occurs, the Court of Appeals then disagreed with us, taking an altogether different path to an altogether different result. It held that, under section 9–109, neither parent could waive, individually or in concert with the other, their child's privilege because their interests conflicted with his. *Id.* at 126, 128, 460 A.2d 49.

Delving into the history of section 9–109, the Court of Appeals observed that, "[p]rior to 1966, there was no privilege of nondisclosure of communications between patient and psychiatrist relating to diagnosis or treatment of the patient's mental or emotional disorder," but that "[i]n the original 1966 legislation, it was specifically provided that disclosure could be compelled by a judge 'in cases involving the custody of children if, in [the judge's] opinion, such disclosure [wa]s necessary to a proper determination of the issue of custody.' " *Id.* at 126–27, 460 A.2d 49 (quoting 1966 Md. Laws, Chap. 503). And that provision, the Court noted, was eliminated by the

General Assembly in 1977. *Id.* at 127, 460 A.2d 49; *see also* 1977 Md. Laws, Chap. 685.

The Court then turned to the current language of section 9–109(c), pointing out that, as a matter of law, a minor is not competent to assert or waive his patient-psychologist privilege and that, under such circumstances, the statute mandates the appointment of a guardian to perform that task, unless the minor already has a "previously appointed guardian." *Nagle,* 296 Md. at 127, 460 A.2d 49.

It turned next to the question whether "the parent who pursuant to court order has custody of a child could qualify as a 'previously appointed guardian' under section 9–109(c)." *Id.* Although the Court observed that such a parent could "arguably . . . qualify as a 'previously appointed guardian' under section 9–109(c)," it declared that "it is inappropriate in a continuing custody 'battle' for the custodial parent to control the assertion or waiver of the privilege of nondisclosure." *Id.* at 127–28, 460 A.2d 49. "[I]t is patent," the Court explained, "that such custodial parent has a conflict of interest in acting on behalf of the child in asserting or waiving the privilege of nondisclosure." *Id.* at 127, 460 A.2d 49. Declaring that, in such circumstances, "the parents, jointly or severally, may neither agree nor refuse to waive the privilege on the child's behalf," the Court held "that when a minor is too young to personally exercise the privilege of nondisclosure, the court must appoint a guardian to act, guided by what is in the best interests of the child." *Id.* at 128, 460 A.2d 49.

Ten years later, this Court considered the same issue, a parent's right to waive a child's patient-psychologist privilege, in the same context, a custody dispute, in *Kovacs v. Kovacs,* 98 Md.App. 289, 633 A.2d 425 (1993). The Kovacs were Orthodox Jews and initially chose to resolve their differences relating to the dissolution of their marriage, including who was to have custody of their six children, before a Beth Din, "a Jewish court [consisting of] a panel of three rabbinic judges." *Id.* at 295, 633 A.2d 425. It is not necessary that we recite the complicated procedural history of that case as it bounced back

and forth between the Beth Din and the Circuit Court for Baltimore City. Suffice it to say that one of the issues presented to this Court, in that case, was the propriety of both the Beth Din and the circuit court relying on the "findings" and "testimony" of the children's psychologist, when that information was disclosed "without the consent of a guardian appointed on behalf of the children as required by *Nagle v. Hooks.*" *Id.* at 306, 633 A.2d 425. Although we chose other grounds on which to reverse the custody portions of the Kovacs' divorce judgment, we nonetheless took the opportunity to reiterate that "the patient-psychologist privilege of a minor cannot be waived during a custody hearing, even when the parents agree, unless the chancellor appoints a guardian to make that decision." *Id.* at 308, 633 A.2d 425.

The holdings of *Nagle* and *Kovacs,* according to the McCormacks, do not extend beyond the boundaries of a custody case. While conceding that section 9–109(c) may require the appointment of an independent guardian in the legal maelstrom of a custody case, where conflicts of interest between parents and between parents and children proliferate, they argue that there is no authority for the proposition that the mandatory language of section 9–109(c) applies to personal injury cases. But, unfortunately for the McCormacks, the plain language of the statute suggests otherwise. It expressly states, without any qualification as to subject matter, that it applies to "all judicial, legislative, or administrative proceedings." CJP § 9–109(b).

Moreover, the potential for a conflict of interest between parent and child is not limited to child custody cases. Other states, with similar statutes or comparable common law rules, have recognized the existence of a disqualifying conflict of interest in criminal cases, adoption cases, and child abuse and neglect cases. *See, e.g., State v. Hunt,* 2 Ariz.App. 6, 406 P.2d 208, 220 (1965) ("[T]he relationship of natural father or mother does not confer upon the holder of that title the right to claim the physician-patient exclusionary privilege if in doing so the claimant is excluding otherwise valid evidence of the parent having committed a crime against his or her child."); *People v.*

*Wood,* 447 Mich. 80, 523 N.W.2d 477, 482 (1994) (" 'Defendant would assert the privilege . . . not to preserve the confidentiality of the child's statements to the psychologist, but to exclude potentially harmful testimony in a murder trial. Even assuming that defendant was the child's guardian, we conclude that defendant was not entitled to assert the statutory privilege . . . .' " (quoting *People v. Lobaito,* 133 Mich.App. 547, 351 N.W.2d 233, 240–41 (1984))); *In re M.P.S.,* 342 S.W.2d 277, 283 (Mo.Ct.App.1961) (concluding that in a neglected child case, "[w]here the privilege is claimed on behalf of the parent rather than that of the child, or where the welfare and interest of the minor will not be protected, a parent should not be permitted to either claim the privilege, . . . or, for that matter, to waive it"); *Ellison v. Ellison,* 919 P.2d 1, 3 (Okla.1996) (holding that in a modification of custody proceeding, "[a] custodial parent may not invoke the privilege . . . to prevent testimony by a physician or psychotherapist as to the child-patient's communication relevant to abuse and neglect").

██ ██ What emerges from *Nagle* and the cases we have cited from other jurisdictions is that the test for determining whether the appointment of a guardian is necessary is not the nature of the case, as the McCormacks suggest, but the presence or absence of a conflict of interest between parent and child. Where a conflict of interest exists, the parent can neither assert nor waive the child's privilege under section 9–109(c). But that is so only when the conflict is so substantial that it imperils a significant interest of the child. Otherwise, it does not overcome the presumption that runs throughout Maryland family law-indeed American family law in general[14]—that parents are presumed to act in the best interests of their child. *See, e.g., Ashcraft & Gerel v. Shaw,* 126 Md.App. 325, 355, 728 A.2d 798 (1999) ("[A] parent is presumed to act in the best interests of his or her child.").

---

14. "[T]here is a presumption that fit parents act in the best interests of their children." *Troxel v. Granville,* 530 U.S. 57, 68, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

The cases we have cited, in which a parent was denied the right to assert or waive his or her child's privilege in this and other states, are cases where the child's health, safety, or welfare hung in the balance. That is not to say that that cannot occur in personal injury cases. It can. But a conflict of interest does not automatically exist in every personal injury case where parents, making a claim to the same pool of money as their child, are faced with the decision of whether to waive the child's privilege to assure that he and they will receive just compensation. This is particularly true here, where there is no allegation that both claims cannot be met and where the interests of both parent and child would be served by a waiver of privilege.

The McCormacks filed suit on behalf of themselves and their son. Their interest was in obtaining compensation for their child and the monies they expended for his care and treatment. Ryan had a substantial interest in recovering damages for his psychological injuries, and there is nothing in Dr. Kaine's testimony that would, on its face, appear to be harmful to Ryan if disclosed. Dr. Kaine testified, at his deposition, that Ryan suffered from post-traumatic stress disorder following the accident, which manifested itself in, among other things, wetting himself during the day, increased anxiety, and nightmares.

Indeed, at trial, Ryan himself testified as to the nightmares he suffered and the fears he had following the accident. Dr. Kaine's testimony would have only attributed these emotional problems to post-traumatic stress disorder, the disclosure of which, it is hard to believe, would have had any impact on Ryan at all. As for the day wetting, while a doctor's disclosure of this kind of activity might conceivably prove devastating to a sixteen-year-old, it beggars common sense to assume that such a disclosure would have any such effect on a nine-year-old testifying as to what occurred when he was only four. Thus, there is no "patent" conflict of interest. *See Nagle*, 296 Md. at 127, 460 A.2d 49.

Moreover, in a custody case, the parents are adversaries and the child is the subject of the litigation. In such a case, "one of two warring parents [may waive or assert the privilege] for reasons unconnected to the polestar rule of 'the best interests of the child.'" *Id.* at 128, 460 A.2d 49. Here, parents and child have common, not conflicting, interests. They seek, for their mutual benefit, compensation for what they both have lost. Because there is no patent conflict of interest, the circuit court should have reviewed the evidence— Dr. Kaine's deposition and Ryan's records—and made a determination as to whether a conflict of interest existed. If it found a substantial intra-familial conflict of interest, the court, on that basis, could have ruled that the McCormacks could neither assert nor waive Ryan's privilege, and then appointed a guardian for that purpose. Instead, it chose, without investigation, to, in effect, foreclose Ryan's right to seek fair and just compensation for any psychological injuries he may have suffered by barring all evidence which supported that claim. Ironically, the decision which, in effect, eviscerated Ryan's claim for psychological injuries was rendered in the name of protecting his interests.

We next turn to the McCormacks' claim that the circuit court erred in excluding Mr. and Mrs. McCormacks' own testimony concerning their long-term observations of Ryan. The McCormacks allege in their brief that they "intended to testify regarding Ryan's refusal to ride the school bus, day wetting of his pants, and other long term observations which would have supported Dr. Kaine's opinions."

When the Board objected to the McCormacks testifying to long-term observations of Ryan, the court sustained the objection, stating:

[Y]ou are getting to a couple of weeks after, your transgression, and the Court of Appeals' pronouncement that since so many things can cause so many things, you need to have medical testimony to connect up changes that are that far. I don't think that I can allow this. If it happens a day or two after, he is upset, things of that sort, fine. But because it is so long away, so many things can cause so many

different things, the appellate court says I shouldn't allow it so I won't.

The basis for the circuit court's refusal to allow the McCormacks' testify as to what they observed over time regarding Ryan's post-accident behavior and emotional problems, was the court's belief that those problems could not be attributed to the accident without corroborative expert testimony, testimony which the court had previously excluded. Because we are vacating the judgment of the circuit court and remanding this case for a new trial, at which time the circuit court will have the opportunity to reconsider the admissibility of Dr. Kaine's deposition and Ryan's psychological and psychiatric records, we need not decide this issue. That being so, we nonetheless feel impelled to make the following observations, in the hope that they may prove of some assistance to the circuit court on remand.

Had the circuit court properly excluded Dr. Kaine's deposition and the psychological records that deposition sought to introduce, it would have been well within its discretion to exclude the McCormacks' testimony as, in fact, it did. But if, on remand, the court admits the Kaine deposition and attendant records, it should reconsider its decision to exclude the McCormacks' testimony, as the Kaine deposition and the records at issue may provide the causal link the court found wanting at the first trial of this matter.

**JUDGMENT VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**